SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-10-0307-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2005-111543-001 |
| JOHN VINCENT FITZGERALD, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Sally Schneider Duncan, Judge

**AFFIRMED**

_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Jeffrey A. Zick, Chief Counsel,
          Criminal Appeals/Capital Litigation
          Kent E. Cattani, Former Chief Counsel,
          Criminal Appeals/Capital Litigation
          Julie A. Done, Assistant Attorney General
Attorneys for State of Arizona

BRUCE F. PETERSON, MARICOPA COUNTY                       Phoenix
OFFICE OF THE LEGAL ADVOCATE
     By   Kerri L. Chamberlin, Deputy Legal Advocate
Attorney for John Vincent Fitzgerald

_____

**P E L A N D E R**, Justice

**¶1**      A jury found John Vincent Fitzgerald guilty of first degree murder and first degree burglary.  He was sentenced to death for the murder and to a prison term for the burglary.  We have jurisdiction over this automatic appeal under Article 6,

Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶2      On April 15, 2005, after traveling from his home in Hawaii to Arizona, Fitzgerald killed his mother, Margaret ("Peggy") Larkin, in her Sun City West home, striking her several times with a samurai sword and shooting her twice in the head.[2]  Peggy's fiancé witnessed the murder.  Fitzgerald was arrested a few blocks away and later confessed during a police interview.

¶3      Fitzgerald was charged with first degree murder and first degree burglary.  At trial, the jury rejected his guilty except insane ("GEI") defense, found him guilty on both counts, and found the crimes were dangerous offenses.  The jury found three aggravating circumstances:  Fitzgerald had a prior conviction for a serious offense, A.R.S. § 13-751(F)(2); the murder was especially cruel, *id.* § 13-751(F)(6); and the victim was seventy years of age or older, *id.* § 13-751(F)(9).  After a mistrial in the penalty phase, a different jury determined that Fitzgerald should be sentenced to death for the murder.  The trial court sentenced Fitzgerald to 10.5 years' imprisonment for

---

[1]     We cite the current version of statutes that have not materially changed since the events at issue.

[2]     The facts are presented in the light most favorable to sustaining the jury's verdicts.  *State v. Hardy*, 230 Ariz. 281, 284 ¶ 2 n.2, 283 P.3d 12, 15 n.2 (2012).

the burglary.

## II. ISSUES ON APPEAL

### A. Denial of Fitzgerald's motions for a new trial

¶4     Near the end of the guilt phase, the trial court dismissed Juror 11, who insisted she had smelled alcohol on a defense expert when he walked past her to testify, although the expert denied drinking and the court detected no such odor. In discharging Juror 11, the court admonished her to say nothing on that topic to the other jurors, and she said she had not. The guilt phase concluded the next week, followed by the jury's finding of aggravating factors two days later.

¶5     The penalty-phase proceedings were suspended at their onset on January 14, 2010, when Fitzgerald had an involuntary emotional outburst during victim impact statements. The court continued the trial to allow for competency proceedings and treatment that successfully restored Fitzgerald's competency.

¶6     On March 23, the trial court declared a mistrial in the penalty phase because of the January 14 incident. During an informal discussion with counsel after the jury was dismissed, Juror 1 asked why Juror 11 had been removed. When told that Juror 11 supposedly had smelled alcohol on the defense expert, Juror 1 allegedly said, "That's right, she did mention that." The record contains no substantiating affidavits or statements from any juror, attorney, or the bailiff regarding the March 23

3

discussion between jurors and counsel.

**¶7**     On April 15, before the second penalty-phase trial began, Fitzgerald moved for a new guilt-phase trial and to vacate the aggravation-phase verdict, arguing that he was prejudiced by juror misconduct during the guilt phase. The trial court denied the motion, finding that it lacked jurisdiction to address the merits because the motion was not filed within ten days of the guilt-phase verdict, as required by Arizona Rule of Criminal Procedure 24.1.

**¶8**     During the second penalty phase, Fitzgerald moved to unseal Juror 1's contact information. Although the motion essentially sought discovery, the trial court denied it because the court had already found jurisdiction lacking on the motion for a new trial under Rule 24.1 and because any motion to vacate judgment under Arizona Rule of Criminal Procedure 24.2 was not ripe because no judgment had been entered. Finally, ten days after the penalty-phase verdict, Fitzgerald filed another motion for a new trial on all phases, which the trial court again denied as untimely.

**¶9**     Fitzgerald argues the trial court violated his due process rights under the Arizona and United States Constitutions by denying his motions for a new trial as untimely under Rule 24.1. He contends the motions were timely and the trial court should have addressed his argument that he was prejudiced by

4

Juror 11's misconduct in the guilt-phase trial. Fitzgerald urges us to remand the case for the trial court to conduct an evidentiary hearing on that allegation.

¶10 We review a "trial court's decision to grant or deny a new trial based on alleged jury misconduct" for an abuse of discretion, *State v. Hall*, 204 Ariz. 442, 447 ¶ 16, 65 P.3d 90, 95 (2003), and review de novo matters involving interpretation of court rules, *Godoy v. Hantman*, 205 Ariz. 104, 106 ¶ 5, 67 P.3d 700, 702 (2003). Based on our interpretation of Rule 24.1, we conclude that Fitzgerald's motions for a new trial were untimely, and therefore the trial court properly refused to consider them.

¶11 As amended in 2002, Rule 24.1 provides in part that "[w]hen the defendant has been found guilty or sentenced to death," the court "may order a new trial or, in a capital case, an aggravation or penalty hearing," when a juror has "been guilty of misconduct by [r]eceiving evidence not properly admitted during the trial or the aggravation or penalty hearing." Ariz. R. Crim. P. 24.1(a), (c)(3)(i). Rule 24.1(b), before and after 2002, requires that "[a] motion for a new trial shall be made no later than 10 days after the verdict has been rendered." Ariz. R. Crim. P. 24.1(b).

¶12 Fitzgerald contends that the phrase "the verdict" in subsection (b) is unclear in the capital-case context. He

5

argues that "a fair and sensible meaning" results only if the term "verdict" is construed "as referring to the death verdict." Fitzgerald asserts that his motions for a new trial therefore were timely because they were filed within ten days after the death-sentence verdict. The State counters that the term "verdict" in Rule 24.1(b) "refers to the verdict in *each* phase of a capital case."

¶13 As this case illustrates, three types of verdicts may be rendered in a capital case: a "general" verdict of "guilty or not guilty," an aggravation verdict, and a capital (or "death") verdict. Ariz. R. Crim. P. 23.2(a), (e)-(f); *see also* A.R.S. § 13-752. One plausible reading of Rule 24.1 would require a capital defendant to move for a new trial within ten days of the verdict in each contested phase to prevent the motion from being time-barred. *See* Ariz. R. Crim. P. 24.1(b) cmt. (noting that a trial court lacks the power to grant a new trial after the Rule 24.1(b) time limit expires (citing *State v. Hill*, 85 Ariz. 49, 330 P.2d 1088 (1958))); *State v. Hickle*, 129 Ariz. 330, 332, 631 P.2d 112, 114 (1981). Under that interpretation, because Fitzgerald moved for a new guilt-phase trial, he was required to file his motion within ten days of the guilt-phase verdict, regardless of when he first learned of possible juror misconduct.

¶14 The competing interpretation, urged by Fitzgerald,

6

would allow a capital defendant to move for a new trial for any phase of the case within ten days of the final verdict. For example, if a defendant is sentenced to death, but then claims error or misconduct occurred in the guilt phase, he could move for a new guilt-phase trial within ten days of the penalty-phase verdict. Similarly, if a jury finds no alleged aggravating circumstances proven, and a defendant seeks a new guilt-phase trial, he could timely move for a new trial within ten days of the aggravation-phase verdict.

¶15 Fitzgerald's proffered interpretation of Rule 24.1 is not persuasive. We read the rule as a whole and in a way that harmonizes its subsections. *State v. Wagstaff*, 164 Ariz. 485, 491, 794 P.2d 118, 124 (1990); *see also Rivera-Longoria v. Slayton*, 228 Ariz. 156, 159 ¶ 17, 264 P.3d 866, 869 (2011) (explaining that we apply principles of statutory construction when interpreting court rules). In prescribing the ten-day period within which a motion for new trial must be filed, Rule 24.1(b) refers in the singular to the "verdict." That term, however, must be read in the context of Arizona's three-phase statutory scheme for capital-case trials. *See* A.R.S. § 13-752. As amended in 2002, Rule 24.1(a) mirrors the statutory scheme by providing that "[w]hen the defendant has been found guilty or sentenced to death by a jury or by the court, the court . . . may order a new trial or, in a capital case, an

7

aggravation or penalty hearing."[3]

¶16      Although subsection (a) is framed in the disjunctive —
permitting the grant of a new trial on any of the three phases
"[w]hen the defendant has been found guilty or sentenced to
death" — this language does not support Fitzgerald's argument
that a capital defendant can timely move for a new guilt- or
aggravation-phase trial within ten days of the penalty-phase
verdict.  Subsection (a) merely recognizes the three distinct
phases and possible verdicts in a capital case.  Although that
provision authorizes a trial court to order a new trial for each
capital-case phase, it neither addresses nor extends Rule
24.1(b)'s time limit for filing a motion for new trial.

¶17      Our pre-2002 case law comports with this reading of
Rule 24.1.  Before 2002, we interpreted that rule to require a
capital defendant to move for a new trial within ten days of the

---

[3]    The 2002 amendments to Rule 24.1 do not meaningfully aid our
analysis.  At that time, this Court amended Rule 24.1(a) and (c)
— but not subsection (b) — in light of *Ring v. Arizona*, 536 U.S.
584 (2002), and the Arizona Legislature's modification of the
capital-case statutory scheme.  *See Chronis v. Steinle*, 220 Ariz.
559, 561 ¶ 12, 208 P.3d 210, 212 (2009) (noting that we amended
the rules of criminal procedure, including Rule 24.1, on an
"emergency interim basis" following the *Ring* decision); *see also*
State Bar of Arizona's Comments to the Arizona Rules of Criminal
Procedure As Amended by the Supreme Court Order of October 11,
2002, R-02-0033, at 7 (Jan. 24, 2003) (on file with the Clerk of
the Court) ("The new language [of Rule 24.1] allows the court to
order a new aggravation or penalty hearing in addition to a new
trial.").

guilt verdict, not the later sentencing order.[4]  *Hickle*, 129

Ariz. at 332, 631 P.2d at 114 (finding untimely a motion filed

twenty-one days after the guilt verdict, but before sentencing);

*see also State v. Spears*, 184 Ariz. 277, 287, 908 P.2d 1062,

1072 (1996) ("Defendant's motion for new trial based on the

state's failure to disclose was made more than three months

after the jury returned its guilty verdict and was therefore

untimely pursuant to rule 24.1 . . . .").  Those cases imply

that a guilt-phase trial is distinct from the subsequent

sentencing-related proceedings (now known as the aggravation and

penalty phases), and that a defendant must move for a new trial

on each contested phase within ten days of the verdict in that

particular phase.  *Cf. State v. Nordstrom*, 230 Ariz. 110, 116–17

¶¶ 25–26, 280 P.3d 1244, 1250–51 (2012) (suggesting that the 60-

day time frame under Rule 24.2 began to run upon judgment of

conviction, not upon later resentencing judgment).

¶18        Because Rule 24.1's language is reasonably susceptible

---

[4]    Before the 2002 amendments to subsection (a), Rule 24.1(a)
and (b) read as follows:

    a. **Power of the Court.**  When the defendant has been
       found guilty by a jury or by the court, the court on
       motion of the defendant, or on its own initiative
       with the consent of the defendant, may order a new
       trial.

    b. **Timeliness.**  A motion for a new trial shall be made
       no later than 10 days after the verdict has been
       rendered.

Ariz. R. Crim. P. 24.1(a)-(b) (2002).

to different interpretations in this setting, we may consider not only the rule's text, but also its subject matter, context, historical background, effects and consequences, and spirit and purpose. *State ex rel. Romley v. Superior Court*, 168 Ariz. 167, 169, 812 P.2d 985, 987 (1991). Practical considerations and notions of judicial economy favor the State's position and the trial court's ruling. When a guilty verdict is returned, if the defendant believes grounds for a new guilt-phase trial exist, allowing the aggravation and penalty phases to proceed to completion before requiring him to move for a new trial on grounds relating solely to the guilt phase would unnecessarily waste time, effort, and resources by the parties, the judiciary, court staff, and the jury. Thus, policy considerations support interpreting Rule 24.1(b) as requiring the timely filing of a motion for new trial no later than ten days after each separate verdict in a capital case to challenge any aspect of the phase in which that verdict was rendered. *See* Ariz. R. Crim. P. 1.2 ("[The Arizona Rules of Criminal Procedure] are intended to provide for the just, speedy determination of every criminal proceeding" and "shall be construed to secure," inter alia, "the elimination of unnecessary delay and expense.").

¶19     We recognize that this interpretation could preclude a defendant who first learns of the grounds supporting a new trial more than ten days after the verdict is rendered from obtaining

10

relief under Rule 24.1.  In this case, for example, Fitzgerald first learned of Juror 11's alleged misconduct well after the guilt-phase verdict, during the discussion between counsel and the other jurors following the penalty-phase mistrial.

**¶20**      Rule 24, however, contains no "discovery rule" exception to the ten-day requirement in Rule 24.1(b).  *Cf.* Ariz. R. Crim. P. 16.1(c) (permitting an otherwise untimely pre-trial motion when "the basis therefor was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it").  Thus, if a defendant who first discovers possible grounds for a new trial after the ten-day time frame has no available relief under Rule 24.1, he would have to resort to a Rule 24.2 motion to vacate the judgment or a Rule 32 petition for post-conviction relief.[5]  *See State v. Adamson*, 136 Ariz. 250, 265, 665 P.2d 972, 987 (1983) (addressing post-conviction relief claim of newly discovered evidence allegedly showing jury misconduct during

---

[5]     Because a defendant may move to vacate the judgment "no later than 60 days after the *entry of judgment and sentence* but before the defendant's appeal," Ariz. R. Crim. P. 24.2 (emphasis added), the longer time frame for filing under Rule 24.2 would begin to run in a capital case upon the penalty-phase verdict, not the jury's guilt verdict, *Nordstrom*, 230 Ariz. at 116-17 ¶¶ 25-26, 280 P.3d at 1250-51; *see also Spears*, 184 Ariz. at 288, 908 P.2d at 1073 (noting that the trial court reached the merits of a motion alleging juror misconduct by apparently construing it as a timely motion to vacate judgment based on newly discovered evidence, rather than an untimely motion for a new trial).

11

voir dire); *Hickle*, 129 Ariz. at 332, 631 P.2d at 114 (noting that a defendant whose motion for new trial was untimely under Rule 24.1(b) might not be "foreclosed from relief" under Rule 24.2).

**¶21** Fitzgerald learned of the alleged juror misconduct on March 23, 2010, but did not move for a new trial until April 15. Thus, Fitzgerald knew about the alleged juror misconduct, on which his motions for new trial were based, considerably more than ten days before he filed the motion. The trial court implied a discovery-rule component in its ruling, stating that Fitzgerald should have moved for a new trial within ten days of when the mistrial was declared. The State apparently agrees with that conclusion, asserting that Fitzgerald's "motion for new trial had to be made no later than 10 days after March 23, 2010 — the date when a mistrial was declared and counsel learned of the basis for the motion." But even were we to imply a "discovery rule" exception to Rule 24.1(b)'s deadline, Fitzgerald's motion was untimely, as the trial court correctly ruled.

**¶22** Based on Rule 24.1's language, policy, practical considerations, and our pre-2002 case law, we hold that in capital cases, Rule 24.1 requires a defendant to timely move for a new trial after each contested capital-case phase, and does not permit one to wait until a penalty-phase verdict before

12

moving for a new trial on a prior phase of trial. Therefore, the trial court properly denied Fitzgerald's motions as untimely without reaching their merits.

**B. Fitzgerald's absence from portions of the second penalty-phase trial**

¶23 Fitzgerald argues the trial court erred in finding that he voluntarily absented himself from portions of the second penalty-phase trial, entitling him to a new penalty-phase trial. He contends his waiver was not voluntary because it was based on his inability to ensure that he could properly comport himself during the proceedings because of mental illness. "We review de novo whether a defendant knowingly and voluntarily waived his right to be present at trial." *State v. Lehr*, 227 Ariz. 140, 145 ¶ 8, 254 P.3d 379, 384 (2011).

¶24 On January 14, 2010, the first day of the initial penalty-phase trial, the trial court suspended the proceedings because of Fitzgerald's disruptive behavior during the victim impact statements. Fitzgerald asked to be removed from the courtroom. After a brief recess, the trial court discussed the matter with counsel outside the presence of the jury and Fitzgerald:

> Frankly, [Fitzgerald is] not able to be composed and he's unable to stay on this floor. He is so loud with his crying and his sobbing that it's disrupting other trials on the floor. I've indicated to the deputy to take him off the floor so that other court proceedings can continue.

13

The court then suspended the penalty-phase trial because Fitzgerald had not knowingly, intelligently, and voluntarily waived his right to be present. The court also explained that if Fitzgerald intended to absent himself from future proceedings, the court would first have to conduct a colloquy with him.

¶25   The trial court later found that Fitzgerald was unable to knowingly and intelligently waive his presence, relying on several physicians' reports. The court ordered Rule 11 proceedings to restore Fitzgerald to competency, and told his attorneys:

> Once [Fitzgerald is] restored, if he chooses to continue with the proceeding, which obviously he has a right to be present, he'll need to conduct [sic] himself and be able to conduct himself in a manner consistent with a trial proceeding. In the alternative, if he feels that he is not going to be able to conform his behavior in an appropriate manner, or that he is going to melt down, he needs to signal that to counsel immediately so that it doesn't happen in the manner it happened before.

¶26   In March 2010, several weeks after the trial court found that Fitzgerald had been restored to competency, the court declared a mistrial in the penalty-phase trial and discharged the jury. From February 11, 2010, to the start of the second penalty-phase trial in May 2010, however, Fitzgerald attended each of the eleven court proceedings in the case.

¶27   On May 19, as jury selection began in the second

14

penalty-phase trial, the court spoke with Fitzgerald and his counsel about the prior outburst that caused the mistrial and the procedures to follow if Fitzgerald became disruptive again. Several medical reports indicated that Fitzgerald was "medicated" and "more stable at this time." The court instructed Fitzgerald to speak with his attorneys during trial if he felt that he could not control himself. The proceedings could then be stopped in an orderly manner. Fitzgerald said he understood those instructions, but was concerned that he could not follow them. Fitzgerald also explained that he "lost control" during the first penalty-phase trial and allegedly "[t]here was no warning."

¶28 Because Fitzgerald did not want to risk any further delay in the proceedings, he told the court that he did not want to attend the victim impact statements:

> I was hoping that I could just not be there during the victim impact, because I just don't want to risk another delay for the whole court. I apologize for the whole delay. It was just a horrible feeling, a horrible thing. I'd rather just not be there during the victim impact and not risk a whole nother [sic] mess, Your Honor.

This was the first time Fitzgerald told the court that he wanted to absent himself from those proceedings. But he also told his attorneys earlier in the day that he did not want to attend the victim impact statements. The court then indicated that it would have a future colloquy with Fitzgerald, but also wanted a

15

signed affidavit acknowledging that defense counsel had advised him "about participating meaningfully in the proceedings and that there was a knowing, intelligent, voluntary decision to waive his appearance for that portion of the penalty phase." Fitzgerald said he understood the court's instruction and had no questions at that time.

¶29 Fitzgerald attended the voir dire of prospective jurors between May 19 and May 26. On May 27, he submitted an affidavit waiving his right to appear for the victim impact statements. He had previously reviewed that waiver with his attorneys. The court conducted an extensive colloquy with Fitzgerald that day and determined that he was taking his prescribed medications. The court also found Fitzgerald's affidavit to be knowingly, intelligently, and voluntarily executed. Later that day, the court conducted another lengthy colloquy after Fitzgerald clarified that he wanted to absent himself from all of the victim impact statements if they lasted more than a day. The court again found a knowing, intelligent, and voluntary waiver.

¶30 The victim impact statements began on June 3. Fitzgerald absented himself from all of those, as well as other portions of the second penalty-phase trial, including the final steps of jury selection on June 2; preliminary jury instructions; opening statements; portions of testimony from

16

defense mitigation expert, Dr. Alan Ellis; testimony from Fitzgerald's family to rebut his mitigation evidence; portions of testimony from the State's mental health expert, Dr. Brad Bayless; and initial closing arguments, but not for the defense's rebuttal closing argument, which he attended. The trial court conducted a colloquy with Fitzgerald every time he absented himself, finding a knowing, intelligent, and voluntary waiver in each instance. At Fitzgerald's request, the court gave a limiting instruction that he was entitled to absent himself from proceedings and that the jury could not consider his absence.

¶31 A defendant has a constitutional right to be present at every stage of a trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article 2, Section 24 of the Arizona Constitution. *State v. Levato*, 186 Ariz. 441, 443, 924 P.2d 445, 447 (1996); *see also* Ariz. R. Crim. P. 19.2. That right applies "whenever [a defendant's] presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *State v. Christensen*, 129 Ariz. 32, 38, 628 P.2d 580, 586 (1981) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)). A defendant, however, may voluntarily waive his right to be present. Ariz. R. Crim. P. 9.1; *see also State v. Avila*, 127 Ariz. 21, 25, 617 P.2d 1137, 1141 (1980) (noting that the record

17

must indicate a knowing, intelligent, and voluntary waiver of a constitutional right). A voluntary waiver "presupposes meaningful alternatives . . . [and] requires true freedom of choice." *State v. Garcia-Contreras*, 191 Ariz. 144, 147 ¶ 11, 953 P.2d 536, 539 (1998).

¶32     Fitzgerald suggests that he did not voluntarily absent himself from the second penalty-phase trial, arguing that he did so only because he was unable to ensure that another disruptive outburst would not occur in those proceedings. That argument, however, is undermined by the trial court's March 2010 finding that Fitzgerald had been restored to competency. He has not challenged that finding on appeal.

¶33     In addition, the trial court frequently asked Fitzgerald if he was appropriately medicated and had lengthy colloquies with him each time he absented himself. Each time, the court found Fitzgerald's waiver to be knowingly, intelligently, and voluntarily made. Moreover, it was Fitzgerald who initiated discussion on May 19 about possibly waiving his rights to attend portions of the trial. That Fitzgerald was previously incompetent did not prevent him from voluntarily waiving his constitutional rights once he was restored to competency. *Cf. United States v. Reynolds*, 646 F.3d 63, 75 (1st Cir. 2011) (upholding the district court's conclusion that the defendant voluntarily waived her right to a

18

jury trial after being restored to competency).

¶34 Fitzgerald also claims that his waiver was not voluntary because the trial court warned him on May 19 that the second penalty-phase trial could proceed in his absence if he could not control his behavior. But the court also said it would first have to find that Fitzgerald was voluntarily absenting himself through that disruptive conduct and that he should speak to his attorneys on a "minute-to-minute basis" if he felt he could not control his behavior. The court also explained that Fitzgerald's absence from the penalty phase was not "desirable" because he was facing the death penalty, and that the better course would be for him to attend the trial and consult with his counsel. In sum, the record does not reflect that Fitzgerald's waiver was involuntary.

¶35 In a related argument, Fitzgerald suggests that *Garcia-Contreras* controls because, like the defendant there, he did not have "true freedom of choice" to voluntarily absent himself from the proceedings. *See* 191 Ariz. at 147 ¶ 11, 953 P.2d at 539. In *Garcia-Contreras*, the defendant moved for a short continuance during jury selection to obtain civilian clothes. *Id.* at 146 ¶ 6, 953 P.2d at 538. After the trial court denied that motion, the defendant absented himself from the entire jury-selection process — even though he apparently wanted to attend those proceedings — once his attorney advised

19

him against appearing in jail garb. *Id.* at 146 ¶ 6, 148 ¶ 14, 953 P.2d at 538, 540. We reversed the convictions and ordered a new trial, holding that the defendant's waiver was involuntary because he had no meaningful alternative other than to absent himself from jury selection. *Id.* at 147 ¶ 11, 953 P.2d at 539.

¶36    This case does not involve the type of dilemma the defendant faced in *Garcia-Contreras*. Under the procedure discussed and agreed to here, Fitzgerald could have attended all the proceedings and, if he felt another impending emotional outburst, he could have informed his counsel and requested a recess or continuance. Unlike the court in *Garcia-Contreras*, the trial court here provided Fitzgerald with a meaningful alternative that appropriately recognized his right to be present, yet still preserved the integrity of the proceedings by avoiding future disruptive behavior. In addition, Fitzgerald did attend various parts of the second penalty-phase trial without incident. The trial court did not err in finding that Fitzgerald voluntarily absented himself from other portions of the second penalty-phase trial.

**C.    Evidence presented during the second penalty-phase trial from Fitzgerald's Rule 11 competency proceedings**

¶37    Fitzgerald argues the trial court erred by allowing the State in the penalty phase to rebut his mental-impairment mitigation evidence by introducing statements he had made during

pretrial Rule 11 competency proceedings. Admission of that evidence, he contends, violated Arizona Rules of Criminal Procedure 11.1 and 11.7, as well as his rights against self-incrimination and to due process under the Fifth and Fourteenth Amendments to the United States Constitution. We review a trial court's rulings admitting evidence in the penalty phase for an abuse of discretion. *State v. Harrod*, 218 Ariz. 268, 279 ¶ 38, 183 P.3d 519, 530 (2008). Legal issues, including constitutional questions, are reviewed de novo. *Id.*

**¶38** During the second penalty-phase trial, Fitzgerald moved to preclude certain statements he had made to Correctional Health Services ("CHS") personnel during the pretrial Rule 11 competency proceedings (the "CHS statements"), evidence the State intended to offer to rebut his mental-impairment mitigation evidence. Those statements, contained in various CHS medical records, suggested that Fitzgerald was malingering. In denying Fitzgerald's motion, the trial court ruled that Rule 11.7 applies only in a "proceeding to determine guilt or innocence," which is not at issue in the penalty phase, and therefore the rule did not apply to Fitzgerald's second penalty-phase trial. The court also concluded that the Fifth Amendment's protection against self-incrimination did not preclude the State's rebuttal evidence because Fitzgerald had already offered psychiatric evidence in the guilt phase and

21

planned to do so again in the penalty phase, thereby placing his mental health at issue.

¶39    Pursuant to the court's cautionary suggestion, the State agreed not to use the CHS statements to elicit any testimony about Fitzgerald's guilt or the murder itself. The State, however, was allowed to use the CHS statements to cross-examine Fitzgerald's mental health expert, Dr. Thomas Thompson, and impeach his opinions through the testimony of Dr. Bayless, the State's mental health expert.

¶40    Dr. Thompson opined in the second penalty phase that Fitzgerald was psychotic when he murdered his mother and that he suffered from a delusional-type disorder, paranoid schizophrenia, or a schizoaffective disorder. Those opinions were consistent with Dr. Thompson's guilt-phase testimony. He had reviewed the CHS statements in forming his opinions. The State referred to those statements in Dr. Thompson's cross-examination and Dr. Bayless's testimony. The CHS statements suggested that Fitzgerald was not delusional and was malingering for the secondary gain of reduced punishment.

¶41    Contrary to Fitzgerald's argument, admission of the State's rebuttal evidence did not violate Rule 11.1. That rule merely addresses the definition and effect of incompetency, prohibiting a defendant from being "tried, convicted, sentenced or punished for a public offense . . . [when he or she] is

unable to understand the proceedings against him or her or to assist in his or her own defense." Ariz. R. Crim. P. 11.1. Rule 11.1 does not address whether evidence obtained from Rule 11 competency proceedings may later be admitted in the penalty phase after a defendant is restored to competency.

¶42 Rule 11.7 governs the admissibility of evidence obtained from, and a defendant's privileged statements made in, Rule 11 competency proceedings. The State persuasively argues that Rule 11.7 does not apply to the penalty phase of a capital case because that phase is neither a "proceeding to determine guilt or innocence," nor the phase in which a defendant's GEI defense or other sanity issues are litigated. Ariz. R. Crim. P. 11.7(a); *see also* A.R.S. § 13-502(A) ("A mental disease or defect constituting legal insanity is an affirmative defense."); *State v. Roque*, 213 Ariz. 193, 223 ¶ 122, 141 P.3d 368, 398 (2006) (insanity at the time of the offense is not at issue in the penalty phase).

¶43 Rule 11.7, however, is grounded in the Fifth Amendment's privilege against compelled self-incrimination, *see State v. Tallabas*, 155 Ariz. 321, 323, 746 P.2d 491, 493 (App. 1987), and that privilege applies to penalty-phase trials, *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of [a defendant's] capital murder trial so far as the protection of

23

the Fifth Amendment privilege is concerned."); *see also State v. Evans*, 104 Ariz. 434, 436, 454 P.2d 976, 978 (1969) (admitting a defendant's incriminating statements from competency proceedings would be "fundamentally unfair"). The rule, of course, cannot override constitutional considerations.

¶44 Fitzgerald, however, waived his privilege against compelled self-incrimination and any protections under Rule 11.7 by offering evidence relevant to his mental health during the second penalty-phase trial. He placed his mental health at issue in that phase by presenting mental-impairment mitigation evidence. Even if Rule 11.7 might apply in the penalty phase, Fitzgerald consented to admission of the CHS statements for purposes of that rule. *See* Ariz. R. Crim. P. 11.7(b)(1).

¶45 Fitzgerald's contention that his "incompetency precluded him from knowingly waiving his constitutional rights at the time the [CHS] statements were made" is unavailing. Fitzgerald's competency had been restored, and no competency issues remained, when he waived his Fifth Amendment privilege by placing his mental health at issue in the penalty phase. *See Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987) ("[I]f a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested."); *see also supra*

24

¶ 33.   In addition, the State's rebuttal evidence was closely tailored to refuting Fitzgerald's allegations of mental impairment and did not re-open the issue of guilt or delve into the murder itself.

**¶46**      *Estelle* does not control when, as here, "a defendant claims a diminished mental condition and offers supporting psychiatric testimony." *State v. Schackart*, 175 Ariz. 494, 501, 858 P.2d 639, 646 (1993); *cf. Tallabas*, 155 Ariz. at 324, 746 P.2d at 494 ("The defendant cannot cast aside the protection of the privilege for matters that benefit him and then invoke the privilege to prevent the prosecution from inquiring into matters that may be harmful to him.").   In sum, Fitzgerald has not established that the trial court abused its discretion in the penalty phase by admitting rebuttal evidence, including his CHS statements, from the Rule 11 competency proceedings.

### III. ABUSE OF DISCRETION REVIEW

**¶47**      We review the jury's finding of aggravating circumstances and the imposition of a death sentence for abuse of discretion.   A.R.S. § 13-756(A).   "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'"   *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)).

25

¶48       Fitzgerald does not contest that the three aggravators alleged and found in this case — (F)(2) (prior serious offense), (F)(6) (especial cruelty), and (F)(9) (age of victim) — were proven beyond a reasonable doubt. Because the record supports those findings, the jury did not abuse its discretion.

¶49       Fitzgerald alleged three mitigating circumstances — honorable military service, good character, and mental impairment. The State presented evidence to rebut each of those mitigating factors. The jury did not find the proffered mitigation sufficiently substantial to call for leniency. *See* A.R.S. § 13-751(C), (E).

¶50       We will overturn a jury's imposition of a death sentence only if no "reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Morris*, 215 Ariz. at 341 ¶ 81, 160 P.3d at 220. Even if we assume Fitzgerald proved each of his alleged mitigating factors, the jury did not abuse its discretion in finding the mitigation insufficient to warrant leniency.

## IV. CONCLUSION

¶51       Fitzgerald's convictions and sentences, including his

26

death sentence, are affirmed.[6]

_____
                John Pelander, Justice

CONCURRING:

_____
Rebecca White Berch, Chief Justice

_____
Scott Bales, Vice Chief Justice

_____
Robert M. Brutinel, Justice

_____
Ann A. Scott Timmer, Justice

_____

[6]    Fitzgerald also raises, but does not argue, thirteen issues "to avoid procedural default and preserve them for further review."  We do not address those issues here.