NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JAMES EDWARDS, *Appellant*.

No. 1 CA-CR 16-0543
FILED 3-27-2018

Appeal from the Superior Court in Maricopa County
No. CR2012-007044-002
The Honorable Rosa Mroz, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Elizabeth B. N. Garcia
*Counsel for Appellee*

Janelle A. McEachern, Chandler
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Jon W. Thompson delivered the decision of the Court, in which Judge Peter B. Swann and Judge James P. Beene joined.

---

**T H O M P S O N**, Presiding Judge:

¶1        James Edwards (defendant) appeals from his convictions for first degree murder, two counts of class 2 felony child abuse, and two counts of class 4 felony child abuse arising from the injury and death of a child in his care and custody.  Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2        Tessa[1] was born in March 2008.  By September 2008, Tessa's biological father was out of the picture.  In December 2010, defendant moved into an apartment with Tessa, her mother Ashley Buckman (mother), mother's sister C.A., and C.A.'s minor daughter.  Defendant and mother had met online.  Prior to this time, C.A. had never seen a bruise or other marks from discipline on Tessa and she didn't have any concerns over how mother was disciplining Tessa.

¶3        Initially, defendant was working and he paid rent and the bills.  Defendant soon took on a parental role that included potty training, bathing, and disciplining Tessa.  Over a short time C.A. became concerned about the discipline defendant was meting out.  Specifically, C.A. had seen or heard defendant hit Tessa twice; each time it appeared to be a "one and done" and Tessa cried.  When she raised the discipline issue with her sister, defendant chimed in "that's my daughter." In January 2011, C.A. was kicked out of the apartment and that was the last time she saw Tessa.

¶4        Over the next year and a half, no fewer than three other members of mother's family saw bruises and/or injuries to Tessa leading them to confront either mother or defendant.  The injuries, bruises, and scratches were on her back, her bottom, her face, and she had a fat lip that was bruised to the point that the witness thought initially she had been eating blue or purple crayons.

---

[1] "Tessa" is a pseudonym used in lieu of the victim's true name. Ariz. R. Crim. Pro. 31.13(c)(5).

¶5        Mother said on various occasions that Tessa was "acting up," "getting' in trouble," "lippy," and that she had to use the "switch" on her or "pop" her.  Mother admitted to a family member hitting Tessa with a hanger and with a belt.  Mother's brother, on New Year's Eve 2011, after the fat lip incident, told defendant to do something or say something if he saw Tessa being hurt.

¶6        Defendant referred to Tessa as his "daughter" and she referred to him as "dad."  He stated to police he disciplined her with his hand or a long remote control.  Mother and defendant exchanged text messages related to Tessa's behavior and discipline.  In one series of texts in February 2012, mother stated "Your daughter just got her shit tore all the way up," defendant replied "why, what happened?," mother described an incident at Walgreens and said "when we got home I split that paddle on her ass again," and defendant replied "LOL, that's what she gets."  A text a couple of weeks later from mother to defendant said "her little ass can't move too fast, it hurts so much, what do you want me to do with her since it's so early still?" and he replied she should watch videos.  In another text, in March 2012, mother said the children[2] had been bad and defendant texted back "they better know I will beat asses when I get home."

¶7        In or around May 2012, mother began working and defendant was the stay at home parent for Tessa and the couple's newborn baby W.E.  Around that time Tessa incurred an injury to her bottom that caused it to blister, mother and defendant exchanged texts on May 1, 2012, about it and the fact that it was "starting to blister again where [he] popped the first ones."  Defendant replied Tessa would be okay, and "[t]hat's what blisters do."  Defendant claimed the injury occurred from hot water when Tessa climbed into the bath tub unsupervised.  Neither party sought medical help for the burn.

¶8        On the evening of May 30, 2012, emergency services received a call from mother and defendant's home.  Inside the home, paramedics found an unresponsive girl apparently two-to-three years old.[3]  The girl was not breathing and had no pulse.  She many visible injuries, including "bruising and various levels or stages of discoloration of blood from head

---

[2] At that time defendant's other two young minor children were staying with them.

[3] She weighed 33 pounds, which is small for a four-year old.

to toe on various parts" of her body, and her nipples appeared burned. Tessa was transferred to Phoenix Children's Hospital by ambulance.

¶9 When police arrived on the scene defendant, mother, and baby W.E. were standing outside. Defendant and mother were eventually transported to the police station. Defendant made spontaneous statements to the police that he "didn't do anything" and that Tessa had fallen and wasn't breathing.

¶10 At the police station defendant was in an interview room, given water, a chance to go to the bathroom, and a snack while mother was interviewed first. After mother was interviewed, defendant was given his *Miranda* rights and he agreed to speak with the officer. Defendant asserted that Tessa had been with her aunt C.A. that day and had returned home injured. He asserted when she left home she didn't have an injured leg. He denied being concerned in the past few days about a concussion. He denied seeing any marks or lacerations on Tessa, although he admitted caring for and disciplining Tessa as well as having seen a "lump" on her back for a couple of days that she might have gotten as a "swat" from someone other than him. He said he heard "a couple of swats . . . and [Tessa] cried a little bit." He stated when mother "whoops [Tessa] I don't question her."

¶11 At the hospital, physical examinations, x-ray and CT scans, revealed evidence of extensive acute, partially healed subacute wounds, and chronic inflicted trauma as well as bruising in various stages all over Tessa's body. On her face alone, she had: (1) multiple bruises of various ages on her forehead; (2) an 8 centimeter by 8 centimeter bruise from the bridge of her nose to her left check and jaw; (3) a bruise under her left eye; (4) bruises to both ears; (5) a twice lacerated lip; (6) a linear pattern mark on her right cheek; (7) and a 9-centimeter bruise that extended from her right cheek to her jaw. The other bodily injuries included, but were not limited to, a traumatic brain injury and multiple non-concurrent cranial subdermal hematomas, three non-concurrent rib fractures, chest trauma causing a collapsed lung, a spiral fracture to her left tibia, multiple linear and curvilinear marks and scars on her arms, legs and hands likely caused, respectively, by a hanger and a rope or phone cord, what appeared to be a bite mark on her upper arm, lacerations on her arms and scalp, a large swollen and bruised injury extending the landscape of her whole back, and her nipples were defaced and variously described as burned or removed. The ER physician testified that there were "bruises of various ages over most every aspect of the child's body."

¶12          Tessa also had a large burn or healing scar tissue on her buttocks that came between the legs to her labia.  The burn measured 12.5 by 10 centimeters on the left buttock and 9 by 5 centimeters on the right.  At trial several doctors testified that the burn was not consistent with a scald burn from a bath tub, which would include "gloving"—the burn running from the feet up the legs.  The doctors opined, variously, that it could have been caused by a flat iron, chemicals, a hot cloth, or by some other method.  When asked later if it could be from a severe diaper rash, the medical examiner stated, "That's not a diaper rash injury."

¶13          Tessa was declared brain dead and a subsequent autopsy indicated additional internal injuries, bruising, multiple head traumas, and bleeding around the optic nerve.  The autopsy revealed a 9 by 12-centimeter pocket of blood had gathered under her skin in her lumbar region which contained "15-20 percent of [Tessa's total] blood volume."  The cause of her death was blunt force trauma, with all of her various injuries contributing to her death.

¶14          While most of Tessa's injuries occurred over a period of time from weeks to months, one of the scalp lacerations was less than 72 hours old.  The injury to the left side of her brain was recent.  The injury to Tessa's back was extensive, it caused swelling and hemorrhaging from neck to buttocks, flank to flank, and the blows had been severe enough to liquify the fat in some locations.  The injury to her back was less than 72 hours old.  The injury to her seventh rib was less than 72 hours old.  The spiral fracture to Tessa's tibia could have been less than 72 hours old.  The acute injuries[4] to the buttocks were less than 72 hours old.

¶15          Back at the apartment, crime scene specialists found eight pieces of toddler clothing with blood and/or hair and tissue on them.  They found blood on the bathroom floor, a hole and crack in the bedroom wall, toilet paper in the bathroom with hair and blood in it, and a black strap with blood stains.

¶16          Defendant was indicted on five felony counts and the case was designated a capital case.  Count 1, a class 1 felony, was felony-murder for Tessa's death arising from child abuse.  Count 3, a class 2 felony, relates to defendant's failure to seek medical care for Tessa for child abuse that occurred in the 72 hours prior to her hospitalization.  Count 5, a class 2 felony, relates to defendant's failure to protect Tessa from ongoing abuse from January 2012 to the date of her hospitalization.  Counts 6 and 7, both

---

[4] Fresh bruising over the existing scar tissue.

class 4 felonies, relate to the burns on Tessa's buttocks, count 6 being the cause of the injury and count 7 being the failure to seek medical care.

¶17        Defendant had a jury trial with sixty days of testimony and was convicted on all five counts. During the aggravation phase the jury found that count 5 had been committed in an especially cruel manner, that defendant was over 18, and Tessa was under age 15. The jury found that counts 1, 3, and 5 were Dangerous Crimes Against Children. The jury was unable to determine his level of participation in the abuse. The trial court sentenced him to life with the possibility of release in 35 years for first-degree murder, and gave him 1,521 days of presentence incarceration credit. For each of counts 3 and 5 defendant was sentenced to consecutive presumptive 17-year terms. For each of counts 6 and 7, defendant was sentenced to consecutive presumptive 2.5-year sentences which would run concurrent to each other. Defendant filed a timely notice of appeal.

## ISSUES

¶18        Defendant asserts the following on appeal:

(1) The trial court erred when it denied the motion to sever the murder count from the three child abuse counts that did not result in the death of Tessa;

(2) The trial court should have disallowed defendant's entire interview with Detective Martin because the statements were involuntary;

(3) The trial court erred in denying defendant's motion for mistrial regarding Detective Martin's testimony as to defendant's truthfulness;

(4) The trial court erred in denying a mistrial due to juror misconduct;

(5) The trial court erred in denying defendant's Rule 20 motion for judgment of acquittal;

(6) The jury's verdicts were unsupported by substantial evidence; and

(7) The trial court erred in denying defendant's motion for a new trial.

**DISCUSSION**

A. <u>Severance</u>

**¶19**		Defendant argues that the felony-murder count, count 1, should have been severed from counts 5-7. The basis for his argument was that the counts not related to the fatal injury are also not related in time or seriousness, and thus should have been severed to promote a fair determination of guilt or innocence. We find no error.

**¶20**		Generally, we review a court's denial of severance for abuse of discretion. *State v. Prince*, 204 Ariz. 156, 159, ¶ 13 (2003). However, when the defendant has failed to renew his motion, "during trial at or before the close of evidence," as is required by Arizona Rule of Criminal Procedure 13.4(c), the denial of severance is reviewed for fundamental error only. *State v. Goudeau*, 239 Ariz. 421, 443, ¶ 54 (2016). Because defendant failed to renew severance argument during or before the close of evidence here, he must show not only that the trial court erred by denying his motion to sever, but that the error was fundamental, and that the error prejudiced him. *See State v. Juarez–Orci*, 236 Ariz. 520, 523, ¶ 11 (App. 2015).

**¶21**		The state may join charged offenses if they are "of the same or similar character." Ariz. R. Crim. P. 13.3(a)(1). Joinder of the counts is permissible when "separate crimes arise from a series of connected acts, provable by much of the same evidence." *Prince*, 204 Ariz. at 160, ¶ 17.

**¶22**		The trial court found count 3 (incidents occurring between May 29 and 30, 2012) and count 5 (incidents occurring between January and May 2012) applied to what was the ongoing abuse of Tessa and both were predicate offenses to the felony-murder. *See* Arizona Revised Statutes (A.R.S.) sections 13-1105(A)(2), -3623(A)(1) (2018). It examined the evidence supporting counts 6 and 7, relating to the burns on Tessa's buttocks, and found that "[a]lthough this injury was not the cause of death, it still contributed to the victim's death because all of the injuries in combination caused significant physiological stress on the victim." These counts represented specific instances of conduct and the supporting evidence would be cross-admissible under Rule 404(b), even if the matters were severed. Further, the text messages between defendant and mother could be used not only to prove the specific crimes related the Tessa's burns, but also to show Tessa was under defendant's care and control.

**¶23**		The trial court denied the motion to sever as not necessary to promote a fair determination of the guilt or innocence of defendant. *See*

Ariz. R. Crim. P. 13.3(a)(1)–(3). We agree and find no abuse of discretion in this ruling.

### B. Defendant's Statements

**¶24** Defendant argues that the trial court "should have disallowed [his] entire [pre-arrest] interview with Detective Martin because his statements were involuntary in their entirety." To this end defendant points to how long he was awake, that he had been held for more than five hours since the emergency responders came until he was interviewed, asserted the Detective badgered him and said Tessa was probably going to die, and handed defendant his homicide division business card. The failure to preclude all of defendant's statements, he argues, is fundamental error.

**¶25** The state counters that there is no evidence that defendant's will was overborn by the detective's actions in the pertinent section of the interview and none of the cited instances rendered his statements involuntary. The state notes both that Detective Martin had taken nearly two hours to interview mother first and that defendant was "eager" to speak to the officer. In fact, he asked to talk to someone. The state argues it has carried its burden of proof by the preponderance of the evidence. The state further asserts that if there was error in the admission of the statements, it was surely harmless as both direct and circumstantial evidence overwhelmingly supports defendant's convictions.

**¶26** Defendant requested a voluntariness hearing for statements made to six different persons. His claim on appeal is limited to his statements to Detective Martin. That interview began at 3:15 a.m., defendant was read his *Miranda* rights and indicated he understood them. At no time did defendant indicate he wanted to end the interview or speak with an attorney. Defendant testified at the hearing that he didn't believe at that time that he was under arrest. He admits that he was willing to speak to the officer.

**¶27** The court reviewed the video of the interview. It noted that although defendant had a long wait prior to the interview, he was given food and water and a chance to go to the bathroom. There was no physical force in evidence and defendant was composed throughout the interview. It stated that aside from a single exception in which Detective Martin yelled at defendant to tell the truth, the detective's voice was calm and his questions were clear. The court issued ten pages of detailed ruling in which some of the statements were determined to be voluntary and some were determined to be involuntary. The court found the interview voluntary and

admissible from Exhibit 1227 page 1, line 1, to page 32, line 1404. It was found inadmissible after that point because Detective Martin did "make promises that [defendant] would [not] face serious charges and would go to jail if he told the truth and talked" with the officer. Defendant did not make an unambiguous request for counsel until the very end of the interview when "all that was left to do was the processing … before booking him into jail."

¶28  When the defendant freely answers questions without asking for counsel or invoking his right to silence, he has waived the rights guaranteed by *Miranda*. *State v. Pineda*, 110 Ariz. 342, 345 (1974). Advice to tell the truth unaccompanied by a threat or promise, does not make a confession involuntary. *State v. Blakely*, 204 Ariz. 429, 436, ¶ 27 (2003). In fact, it is a valid interrogation tactic. *State v. Amaya-Ruiz*, 166 Ariz. 152, 165 (1990). Further, although it was as the trial court noted a "long wait," it was because Detective Martin had been to the hospital to see the extent of Tessa's injuries himself and had spent significant time interviewing mother.

¶29  We review a trial court's evidentiary ruling to admit a defendant's statement for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 126, ¶ 25 (2006) (citation omitted). In determining whether the statements were voluntary we look only the evidence presented at the hearing, and nothing else. *See State v. Huerstel*, 206 Ariz. 93, 107, ¶ 62 (2003). Finding no abuse of discretion in the admission of the first portion of defendant's statements to Detective Martin as voluntary, we affirm.

## C. Defendant's Motions for Mistrial

¶30  We review the denial of a motion for mistrial under an abuse of discretion standard. *State v. Kuhs*, 223 Ariz. 376, 380, ¶ 18 (2010). Courts have considerable discretion to determine whether conduct warranting a mistrial exists or whether there is need for a corrective action. *State v. Slover*, 220 Ariz. 239, 246, ¶ 22 (App. 2009).

¶31  Defendant moved for mistrial on two occasions. In December 2015, he sought a mistrial based on alleged juror misconduct. One juror, juror 11, drew three drawings one of which was an unflattering picture of the defense attorney with fangs and a bubble saying "hypothetically"—something counsel often said. That picture was seen by the bailiff and some of the other jurors. Some of the jurors laughed at it. Juror 11 stated he didn't have any negative feelings for defense counsel, but had been bored. Briefs were filed, the court heard argument and interviewed all the jurors. Defendant asserts that these acts by juror 11 and others comprise jury

misconduct and demonstrate that at least one juror was antagonistic to the defense attorney and possibly to defendant. Thus, he argues, the trial court should have granted him a mistrial.

**¶32** The state asserts that the trial court cured any conceivable effect that the drawing had by striking juror 11, in an abundance of caution, and by ensuring the remaining jurors were fair, objective and impartial. The court questioned each juror separately and spoke to them about the need for both the appearance and actuality of a fair trial. The court stated that the jurors were sincere and were taking the case very seriously.

**¶33** In *State v. Payne* our supreme court found a trial court did not err in failing to strike a juror or declare a mistrial, where one juror advised the court that juror 28 was mocking witnesses and complaining about defense witnesses "under her breath," but potentially loud enough to be heard at the prosecution's table. 233 Ariz. 484, 510–11, ¶¶ 100–104 (2013). As the court said, "The trial court, which has the opportunity to observe the prospective juror's demeanor and the tenor of his answers, is in a position to determine first hand whether a juror can render a fair and impartial verdict." *State v. Chaney*, 141 Ariz. 295, 303, (1984) (internal quotation marks and citations omitted). It further noted, if the trial court did not abuse its discretion in failing to strike the juror, it did not err by denying a mistrial. *Payne*, 233 Ariz. at 511, ¶ 104.

**¶34** The drawing is in the record and we have reviewed it. For the reasons given by the trial court, we find no abuse of discretion in the denial of a mistrial for juror misconduct.

**¶35** Defendant moved for a second mistrial in January 2016 based on Detective Martin's testimony. Specifically, Detective Martin voluntarily offered that he raised his voice during the pre-arrest interview with defendant because he was "frustrated," because he felt he was "not getting the truth." Defendant immediately objected. The jury was instructed "Detective Martin's statements of disbelief cannot be used to prove whether the defendant or [mother] was truthful or untruthful" and that the jury is the sole judge of credibility.

**¶36** After briefing, the court found the officer had not given "a lay or expert opinion on whether defendant was truthful during the interview but to explain why he raised his voice." Defendant's motion for mistrial was denied. The court found no misconduct by the state or the officer and found the probability that the statement would influence the jurors to be slight, given the immediate curative instruction.

¶37        Defendant on appeal asserts that the detective's belief that he was not telling the truth went to the heart of the defense and the denial of a mistrial was fundamental error. The state argues it was: (1) not an improper remark; (2) the jury was not influenced; and (3) any error was invited because defense counsel attacked Detective Martin's interrogation methods and suggested the officer coerced suspects.

¶38        Testimony from an expert or a lay witness is prohibited where it opines as to the truthfulness of a statement by another witness. *State v. Reimer*, 189 Ariz. 239, 241 (App. 1997). An opinion about the truthfulness or credibility of another witness invades the province of the jury. *State v. Moran*, 151 Ariz. 378, 383 (1986). However, "[l]ay witnesses may give opinion testimony, even as to the ultimate issue, when it is 'rationally based on the perception of the witness and ... helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" *State v. Doerr*, 193 Ariz. 56, 63, ¶ 26 (1998) (quoting Ariz. R. Evid. 701) (an officer may give his reasoning as to why he did not believe defendant's story); *State v. Martinez*, 230 Ariz. 382, 385, ¶¶ 12–13 (App. 2012) ("Officer Fortune's testimony that he did not believe Martinez's statements was necessary to explain why Fortune did not continue to investigate the alleged stolen vehicle").

¶39        "An improper remark compels a new trial only if it probably influenced the jury in determining their verdict and thus denied the defendant a fair trial." *Prince*, 204 Ariz. at 160, ¶ 20. Here, to the extent Detective Martinez's comment was even improper, the court took corrective action, both striking the comment and instructing the jury, and we presume the jurors followed their instructions. *See id.* at 158, ¶ 9. However, we agree with the trial court that the detective was describing the interview and the statement was not intended to give an opinion. Finding no abuse of discretion, we affirm the denial of a mistrial based on the detective's testimony.

### D.  The Rule 20 Motion and the Verdicts

¶40        Defendant claims substantial evidence does not support the verdicts and that the trial court erred in denying his Rule 20 motion at the close of the state's evidence. He argues that there is no evidence defendant caused the injuries to Tessa and "nothing here to indicate[] that Mr. Edwards knew or should have known that Minor Victim was in need of medical assistance" to support the child abuse convictions or felony-murder. He asserts that there was no evidence to support the counts related to the burns, other than the bathtub incident which he admitted to police.

**¶41** The state correctly points out that both of these claims concern whether substantial evidence existed at certain points of the trial. When a defendant claims that evidence is insufficient to support the verdicts, we will not reweigh the evidence. *State v. Guerra*, 161 Ariz. 289, 293 (1989). Rather, we view the evidence in the light most favorable to upholding the verdicts and then ascertain whether substantial evidence exists to sustain the verdicts. *State v. Barger*, 167 Ariz. 563, 568 (App. 1990). Likewise, a judgment of acquittal is only appropriate when "there is no substantial evidence to warrant a conviction." Ariz. R. Crim. P. 20(a). We review the denial of a Rule 20 motion de novo. *State v. Parker*, 231 Ariz. 391, 407, ¶ 69 (2013). Substantial evidence is "such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 67 (1990) (quoting *State v. Jones*, 125 Ariz. 417, 419 (1980)).

**¶42** First degree murder, A.R.S. § 13-1105(A)(2) (2012), includes:

> Acting either alone or with one or more other persons the person commits or attempts to commit … child abuse under § 13-3623, subsection A, paragraph 1 … and, in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person.

Child abuse, pursuant to A.R.S. § 13-3623 (2012), means:

> **A.** Under circumstances likely to produce death or serious physical injury, any person who causes a child … to suffer physical injury or, having the *care or custody of a child … who causes or permits* the person or health of the child … to be injured or who causes or permits a child … to be placed in a situation where the person or health of the child …is endangered is guilty of an offense as follows:
>
> 1. If done intentionally or knowingly, the offense is a class 2 felony and if the victim is under fifteen years of age it is punishable pursuant to § 13-705.
>
> ….
>
> 3. If done with criminal negligence, the offense is a class 4 felony.
>
> …

**F.** For the purposes of this section:

1. "Abuse", when used in reference to a child, means abuse as defined in § 8-201 …

2. "Child" means an individual who is under eighteen years of age.

…

4. "Physical injury" means the impairment of physical condition and includes any skin bruising, pressure sores, bleeding, failure to thrive, malnutrition, dehydration, burns, fracture of any bone, subdural hematoma, soft tissue swelling, injury to any internal organ or any physical condition that imperils health or welfare.

5. "Serious physical injury" means physical injury that creates a reasonable risk of death or that causes serious or permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb. [Emphasis added.]

Abuse of a child under A.R.S. § 8-201(2) (2012) is defined, in pertinent part, as:

the infliction or allowing of physical injury, impairment of bodily function or disfigurement …and is caused by the acts or omissions of an individual having care, custody and control of a child.

**¶43**　　　To begin with, there is substantial evidence throughout the record that defendant had "care and custody" of Tessa. They lived in the same home, he watched her while her mother worked, when he worked the income he earned supported the family, he bathed Tessa, he fed her, and he disciplined her. He stated he put salve on the injuries to her buttocks. He discussed Tessa's injuries and discipline with mother. In his police interview, defendant referred to Tessa as his daughter and she was known to refer to him as dad. This is sufficient evidence of defendant's care and custody of the victim. *See State v. Jones*, 188 Ariz. 388, 392, 394 (1997); *see also State v. Smith*, 188 Ariz. 263, 264-65 (App. 1996) (evidence that defendant called the victim his daughter, bathed her and fed her sufficient to support a felony-murder conviction predicated on child abuse).

¶44        Counts 3 and 5 concerned child abuse likely to lead to death or serious physical injury.  Count 3 covered the 72 hours prior to Tessa's hospitalization.  There was evidence that Tessa received a spiral fracture to her tibia, a brain injury, a scalp laceration that would have bled heavily, a severe injury to her back, and a fractured rib during that time.  Count 5 covered the approximately five months prior to her death.  The injuries to Tessa which were incurred during this time are numerous and evidence presented aligned the dates of the injuries with the dates in count 5.  Those injuries include, but are not limited to, multiple brain injuries, signs that over time Tessa had been beaten with a hanger and some sort of cord that left patterned scars on nearly all parts of her body including her face, a broken finger, a broken toe, two broken ribs, something that removed her nipples, a bite mark on her arm, and "bruises of various ages over most every aspect of the child's body."

¶45        Many of these injuries were clearly visible to anyone who looked.  Four of mother's relatives testified to visible injuries.  The responding paramedic stated she had injuries "from head to toe," including extensive damage to her mouth. Evidence showed that those mouth injuries would have bled considerably.  She had extensive scarring and bruising that someone who bathed her would have seen.  Tessa had a fresh leg fracture which would have been extremely painful and she would probably have been unable to walk.  Defendant admitted to seeing the "lump" on Tessa's back a couple of days before paramedics were called.  No reasonable juror could believe that defendant did not see the injuries.

¶46        Whether defendant, himself, or mother caused these injuries the jury was ultimately unable to tell.  What is undisputed is that through all of this defendant failed take her to a medical professional for care. Failure to seek medical attention is child abuse under A.R.S. § 13-3623. *Payne*, 233 Ariz. at 508–09, ¶¶ 88–90.  As far back as New Year's Eve 2011, after the fat lip incident, mother's brother told him if you see mother injuring Tessa you have to act.  There is substantial evidence to support the convictions for counts 3 and 5 which make up the predicate offenses for count 1.

¶47        As the state points out, there is no dispute that Tessa was abused, with multiple serious injuries from child abuse over a period of time, died as a result of those injuries, and was under age 15 at death.  There is evidence that she died from blunt force trauma, with all of her various injuries contributing to her death.  This evidence, along with defendant's having care and custody l of the child, supports the conviction for count 1 murder.

**¶48**            Defendant admitted during his police interview to a modest injury to Tessa arising from a too hot bath.  His text messages to mother include reference to the burns Tessa suffered while he was [presumably] bathing her, that the burn resulted in two occurrences of blisters, and that he failed to get her medical help for those burns which left permanent scarring.  This is evidence supporting counts 6 and 7.

**¶49**            Having found that substantial evidence supports the verdicts, and all of that evidence having been introduced prior to defendant's motion for acquittal, we find no error in the denial of the motion to dismiss.

### E.  Motion for New Trial

**¶50**            Finally, defendant argues that the trial court erroneously denied his motion for a new trial.  Generally, a trial court's denial of a motion for new trial is reviewed for an abuse of discretion.  *State v. Hoskins*, 199 Ariz. 127, 142, ¶ 52 (2000).

**¶51**            Rule 24.1 controls a motion for new trial.  It reads, in pertinent part,

> (a) Power of the Court. When the defendant has been found guilty or sentenced to death by a jury or by the court, the court on motion of the defendant, or on its own initiative with the consent of the defendant, may order a new trial or, in a capital case, an aggravation or penalty hearing.
>
> (b) Timeliness.  A motion for a new trial shall be made *no later than 10 days after the verdict has been rendered*.
>
> (c) Grounds. The court may grant a new trial or aggravation or penalty hearing for any of the following reasons:
>
> (1) The verdict is contrary to law or the weight of the evidence;
>
> (2) The prosecutor has been guilty of misconduct;
>
> (3) A juror or jurors have been guilty of misconduct …
>
> (4) The court has erred in the decision of a matter of law, or in the instruction of the jury on a matter of law to the substantial prejudice of a party;

(5) For any other reason not due to the defendant's own fault the defendant has not received a fair and impartial trial or capital sentencing. [Emphasis added.]

**¶52** On appeal the state argues many alternative reasons as to why denial of the motion was proper, we focus on one—timeliness. Rule 24.1(b) provides a party seeking a new trial must file their motion within ten days. Defendant did not do so. The jury rendered their verdict on February 18, 2016. Following the verdict, when defendant orally asked the court to extend the deadline, the trial judge even raised the issue of timeliness possibly being jurisdictional, at which point both parties indicated they would "look[] it up." Nevertheless, defendant filed his motion for a new trial on February 29, 2016.

**¶53** Rule 24.1 requires the filing of a motion for new trial within ten days of the guilty verdict. *State v. Fitzgerald*, 232 Ariz. 208, 213, ¶ 22 (2013). Pursuant to Ariz. R. Crim. P. 1.3(A)(3) the ten days are calendar days and, excluding the 18th, defendant's motion was late by three days. Timeliness is jurisdictional. *See Maule v. Arizona Superior Court*, 142 Ariz. 512, 515 (App. 1984). A trial court has no jurisdiction to grant a new trial if the motion is not filed within ten days of the verdict. *State v. Villarreal*, 136 Ariz. 485, 487 (App. 1983). For this reason, we need not examine defendant's other claims under the abuse of discretion standard. The trial court is affirmed.

## CONCLUSION

**¶54** For the foregoing reasons, the convictions and sentences are affirmed.

