IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA
*Appellee,*

*v.*

JASPER PHILLIP RUSHING,
*Appellant.*

No. CR-15-0268-AP
Filed November 6, 2017

Appeal from the Superior Court in Maricopa County
The Honorable Michael W. Kemp, Judge
No. CR2010-007882

**AFFIRMED IN PART, VACATED IN PART, REMANDED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Tucson, Ginger Jarvis (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Sharmila Roy (argued), Laveen, Attorney for Jasper Phillip Rushing

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL, BOLICK, GOULD, and BERCH (RETIRED)* joined.

---

* Justice John R. Lopez, IV, has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Rebecca White Berch, Justice of the Arizona Supreme Court (retired), was designated to sit in this matter.

JUSTICE TIMMER, opinion of the Court:

**¶1** Jasper Phillip Rushing was sentenced to death after a jury found him guilty of first degree murder. We have jurisdiction over this automatic appeal under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 13–4031.[1] We affirm Rushing's conviction. To comply with the United States Supreme Court's decision in *Lynch v. Arizona*, 136 S. Ct. 1818 (2016) ("*Lynch II*"), we vacate the death sentence and remand for a new penalty phase proceeding.

## BACKGROUND[2]

**¶2** In August 2010, Rushing and victim Shannon P. were imprisoned in the Lewis Prison Complex. They were temporarily housed together in an isolation cell after each expressed safety concerns with his prior assigned housing. The cell was designed for one person. It had one bed, but prison staff provided a floor mattress so each man had a place to sleep.

**¶3** On September 10, Rushing killed Shannon while in their cell. There were no witnesses. Corrections officer Joel Valdovinos said nothing seemed unusual when he conducted hourly welfare checks of the inmates that morning. And when Rushing was temporarily removed from the cell around 10:30 a.m. for a prisoner count, he was calm and pleasant.

**¶4** Just before 1:00 p.m., Valdovinos opened the "food trap" in the cell door to serve lunch. He could not see inside the cell because it was dark, as it had been all morning. An investigator later determined that the cell light was broken. Rushing "put his face to the trap" and said, "you have to call IMS [the "inmate management system"]. I think I just killed my cellie." Valdovinos asked if Rushing was being serious or lying, and Rushing replied, "No . . . I beat him up and I think I killed him." Using a flashlight, Valdovinos illuminated the cell and saw Shannon lying on the

---

[1] We cite the current versions of statutes unless they have materially changed since Rushing committed the offense.

[2] We view the facts in the light most favorable to sustaining the jury's verdict. *State v. Gallegos*, 178 Ariz. 1, 9 (1994).

bed with a "large gash in his throat." Valdovinos asked Rushing what weapon he had used to inflict the injuries, and Rushing said he used "a razor blade he had on the sink."

¶5 Valdovinos immediately called for help, and then told Rushing to turn around so he could cuff him through the trap door. Rushing responded, "can I have a sip of coffee real quick?" After Valdovinos replied, "[n]o dude . . . . Look at what you just did, man," Rushing nevertheless "took a sip . . . turned around, put his hand[s] through the trap," and Valdovinos handcuffed him.

¶6 After more officers arrived, Rushing was removed from the cell. According to an officer, Shannon was found unconscious but alive, lying face up on the bunk with his throat "clearly" cut and "his head and his left arm kind of draped over on the ground." His "face had been smashed in . . . like he had been bludgeoned. His no[se] was flattened out against his head." His severed penis was found on the floor. Shannon could not be resuscitated, and he died en route to the hospital. A medical examination later determined Shannon died from "blunt force and sharp force injury," but could not identify the order of injuries to his head, face, neck, and penis.

¶7 Two weapons were found in the cell: (1) a bloody disposable razor, wrapped on one end with cellophane to form a handle, and (2) a thick, rolled-up, soft-cover book contained within a sock, which, in turn, had been wrapped in a sheet.

¶8 The State indicted Rushing on one count of premeditated first degree murder pursuant to A.R.S. § 13-1105 and sought the death penalty. That Rushing killed Shannon was not contested at trial; the only issue was whether he did so with premeditation. The jury found Rushing guilty as charged. In the aggravation phase, the jury found three aggravating factors: (1) Rushing had been previously convicted of another offense for which life imprisonment or death could be or had been imposed, *see* A.R.S. § 13-751 (F)(1); (2) Rushing committed the offense in an especially heinous or depraved manner, *see id.* § 13-751(F)(6); and (3) Rushing committed the offense while in the custody of the state department of corrections, *see id.* § 13-751(F)(7)(a). After considering mitigation evidence, the jury

3

determined that Rushing should be sentenced to death.

## DISCUSSION

### A. Guilt Phase

### 1. The Trujillo statement

¶9 After officers responded to Valdovinos's request for help, they removed the handcuffed Rushing from the cell. Without first advising Rushing of his *Miranda* rights, corrections officer Trujillo asked him "what he had used to assault [Shannon]." Rushing answered that he had used "rolled up magazines to beat [Shannon] unconscious and then used a razor blade with a small handle to cut his neck and to cut off the penis" (hereafter, the "Trujillo statement").

¶10 Before trial, Rushing moved to suppress the Trujillo statement, arguing it was made involuntarily and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The prosecutor responded that she did not intend to call Trujillo as a witness. Relying on this avowal, the trial court considered the matter moot and did not decide the statement's admissibility.

¶11 During the trial's guilt phase, corrections Sergeant Damian Ryan testified he heard Rushing "talking about the assault" with an unnamed officer soon after Rushing was pulled from the cell. Neither the prosecutor nor defense counsel asked Ryan to relate what he had overheard. But, without objection, the trial court posed a juror's question, which elicited the Trujillo statement:

> The Court: Did you hear anything that Mr. Rushing said while he was in your presence and, if so, what was said?
>
> [Ryan]: I'd have to refer to my report. I heard Mr. Rushing say, I hit him with a roll of magazines until I knocked him out and then I cut his throat and cut his dick off. He then said the razor blade was on the sink.

The prosecutor and defense counsel each asked follow-up questions confirming what Ryan overheard. Also, without objection, the prosecutor

4

later elicited an opinion from Dr. John Hu, the medical examiner who conducted the autopsy, that the order of injuries described in the Trujillo statement was consistent with Shannon's wounds. Finally, the prosecutor referred to the Trujillo statement repeatedly during closing argument to argue that the murder was premeditated—the only issue at trial.

### a. Standard of review

¶12 Rushing argues that the trial court violated his Fifth Amendment rights by admitting the Trujillo statement. The State does not dispute that introducing the statement was error. The parties disagree, however, on whether the error should be evaluated under the fundamental error or harmless error standard of review.

¶13 The State argues that Rushing waived the issue by failing to object to the juror's question, and fundamental error review is therefore appropriate. The State alternatively argues that Rushing "invited any possible error by agreeing to permit the trial court to ask the juror's question that led to Sergeant Ryan's answer." Rushing contends he preserved his objection through the motion to suppress, and harmless error review is therefore warranted.

¶14 Rushing did not invite the error. The invited error doctrine prevents a party from injecting error into the record and then profiting from it on appeal. *State v. Logan*, 200 Ariz. 564, 566 ¶ 11 (2001). Defense counsel did not inject the error here by asking Ryan to relate what he had overheard. A juror posed that question to the trial judge, who asked it of Ryan. Defense counsel's failure to object to the question constitutes waiver, not invited error.

¶15 Although Rushing moved pre-trial to prevent the State from introducing the Trujillo statement, the court did not rule on the merits, as the State disclaimed any intent of offering the statement. But even if the trial court had ruled on the motion to suppress, Rushing needed to object to the juror's question to preserve the issue for appeal. The earlier motion preserved Rushing's objection to *the prosecution* introducing the contested statement. But the prosecutor did not elicit the statement from Sergeant Ryan; a juror did through the judge. When the judge read the proposed juror question to counsel for both sides outside the jury's hearing, defense

counsel was required to raise any objection then, but he did not. *Cf. Matchett v. State*, 364 S.E.2d 565, 567 (Ga. 1988) (concluding that while questions directly from a juror to a witness are generally not permitted in Georgia, appellant's failure to object waived the issue); *Handy v. State*, 30 A.3d 197, 211 (Md. Ct. Spec. App. 2011) (concluding that the failure to object to a juror question waives the issue on appeal).

### b. Merits

**¶16**    "A fundamental error is error that goes to the foundation of the case, takes from the defendant a right that is essential to his defense, and is of such magnitude that the defendant could not possibly have received a fair trial." *State v. Escalante-Orozco*, 241 Ariz. 254, 272 ¶ 40 (2017) (citing *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005)). The defendant must prove that the error was fundamental and that it prejudiced him. *Id.*

**¶17**    Focusing on the latter requirement, Rushing argues he was prejudiced by admission of the Trujillo statement because it tended to show premeditation. The medical examiner could not determine the order in which Rushing inflicted Shannon's wounds. Without the Trujillo statement, Rushing asserts, "there was no other evidence before the jury of the order of the blows or more significantly [Rushing's] apparent thought process prior to the assault." According to Rushing, "[w]ithout that statement, the jury could have found [him] guilty of second-degree murder."

**¶18**    Rushing murdered Shannon with premeditation if he acted "with either the intention or the knowledge that he [would] kill another human being, when such intention or knowledge precede[d] the killing by any length of time to permit reflection." A.R.S. § 13-1101(1) (defining premeditation). The murder was not premeditated if it was "the instant effect of a sudden quarrel or heat of passion." *Id.* The State was required to prove actual reflection but could do so through circumstantial evidence. *See State v. Ovante*, 231 Ariz. 180, 184 ¶ 14 (2013) ("There is no prescribed period of time which must elapse between the formation of the intent to kill and the act of killing, but the record must at least circumstantially support that a defendant considered his act and did not merely react to an instant quarrel or in the heat of passion."); *State v. Thompson*, 204 Ariz. 471, 479 ¶ 31 (2003) (noting that the passage of time is one factor among others that can show

actual reflection).

¶19        Admission of the Trujillo statement was neither fundamental error nor prejudicial. Apart from the statement, the circumstances of the murder sufficiently proved premeditation. Shannon was not killed by a quick strike. Rushing used two weapons—a bludgeon and a razor. He delivered at least four hard blows to Shannon's head and face, made deep cuts on both sides of his neck, and likely spent time completely severing his penis with just a razor (the medical examiner testified it would not have been easy to cut through the penis). The jury could have reasonably concluded that switching weapons, moving to different areas of Shannon's body, and taking the time to remove the penis afforded Rushing sufficient time to reflect on his actions.

¶20        There was no evidence of shouting, fighting, or other indications of a sudden quarrel between Rushing and Shannon that might suggest Rushing acted without reflection. Shannon had no defensive wounds, which might have suggested a brawl, and he was found lying on the bed with most of the blood pooled at its head and the adjacent floor. Rushing did not appear distressed immediately after the murder and, indeed, appeared calm and even asked to sip coffee before being handcuffed while Shannon lay gasping for air nearby.

¶21        The Trujillo statement did not add much to the premeditation issue. Although Rushing related the order in which he wounded Shannon, this was an after-the-fact recitation of events, not a statement about any pre-attack plan. We fail to see how the statement reflects Rushing's thought process, as he now argues. Indeed, defense counsel argued in closing that the Trujillo statement was only "an acknowledgment of what he did" and "doesn't show any premeditation at the time of the offense at all." And even if the order of wounds is somehow significant to showing premeditation, the jury would have likely concluded that Shannon was initially knocked unconscious before the razor attack, even without the Trujillo statement. There was no blood on the tops or bottoms of Shannon's feet, the blood was confined to the area on and immediately around the bed, and he did not have any defensive wounds. This evidence indicates that Rushing attacked Shannon while he was on the bed. As it is unlikely that Shannon would have remained still while being cut, the most plausible

explanation is that he was initially knocked unconscious.

**¶22**    The Trujillo statement also did not unfairly prejudice Rushing's defense theory.  Defense counsel claimed that Rushing lacked a motive to kill Shannon but "something set [Rushing] off," and that this may have been "a case of heat of passion or sudden quarrel."  He pointed out that Rushing "went over and beyond what was necessary to kill," indicating Rushing was "completely out of control."  The Trujillo statement, which corroborated the physical evidence, was not inconsistent with the defense theory that Rushing was "out of control."

**¶23**    In sum, the trial court did not commit fundamental error by eliciting testimony about the Trujillo statement through the juror's question.

## 2.  Gruesome Photographs

**¶24**    Over Rushing's objection, the trial court admitted one murder scene photo and four autopsy photos during the guilt phase:  Trial exhibits 21 (cell), 41 (peeled-back scalp and skull surface), 42 (brain), 43 (groin), and 47 (severed penis and a knocked-out tooth).  We review the court's ruling for an abuse of discretion. *See State v. Jones*, 203 Ariz. 1, 9 ¶ 28 (2002).

**¶25**    Generally, "[w]hether the trial court abused its discretion in admitting a photograph turns on (1) the photograph's relevance, (2) its tendency to inflame the jury, and (3) its probative value compared to its potential to cause unfair prejudice."  *State v. Goudeau*, 239 Ariz. 421, 459 ¶ 153 (2016) (citation and internal quotation marks omitted); Ariz. R. Evid. 403.  Rushing argues that the court violated his due process rights because the photos were not relevant to deciding whether the murder was premeditated, and they were unfairly prejudicial due to their gruesome depictions.

**¶26**    The photographs were relevant.  The photo of the cell (exhibit 21) showed that Shannon's blood was largely confined to the head of the bed, which suggested he was attacked while lying down and not as

the result of a heat-of-passion fight as Rushing argued.

¶27          Dr. Hu used the autopsy photos to explain Shannon's injuries and to testify about the cause of death.  Cause of death is always relevant.  *Cf. State v. Morris*, 215 Ariz. 324, 339 ¶ 70 (2007) ("Photographs of a victim's body are always relevant because the fact and cause of death are always relevant in a murder prosecution." (citations and internal quotation marks omitted)); *State v. Hampton*, 213 Ariz. 167, 173 ¶ 18 (2006) (stating the same and adding that photos may be relevant "to show the fatal injury, to determine the atrociousness of the crime, to corroborate State witnesses, to illustrate testimony, or to corroborate the State's theory of the crime." (citations and internal quotation marks omitted)).  This is so even though Rushing did not dispute how Shannon was injured or his cause of death.  *Cf. Hampton*, 213 Ariz. at 173 ¶ 19 ("Even if a defendant does not contest certain issues, photographs are still admissible if relevant because the burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." (quoting *State v. Dickens*, 187 Ariz. 1, 18 (1996)).

¶28          The autopsy photos were also relevant to show premeditation.  Exhibits 41 and 42 depict red areas on the scalp and brain that supported Dr. Hu's conclusion that Shannon suffered multiple contusions and hemorrhaging, which are generally caused by "a significant amount of blunt force trauma to the head."  This evidence shows that Rushing hit Shannon several times with blows that would necessitate a sufficient passage of time between strikes to build force, which could permit reflection.

¶29          Exhibit 43 shows Shannon's external genitalia where the penis had been removed, and Exhibit 47 shows that the severed penis has jagged edges.  Both photos showed the denseness of the penis.  The jury was shown these photos while Dr. Hu explained that the penis had been severed at "the root" along with some of the scrotum; many slashes were required to sever the penis, as reflected by the jagged cutting edge; and it would have been difficult to cut through the appendage with a razor blade.  This evidence supports a conclusion that Rushing had to spend some time severing the penis, which gave him time to reflect.  The knocked-out tooth, shown in a corner of exhibit 47, shows the severity of the head blows and is

relevant in the same manner as exhibits 41 and 42.

¶30　　　　Although the photos are graphic, the trial court acted within its discretion by finding that their probative value was not outweighed by any prejudicial effect. *See* Ariz. R. Evid. 403. The photo of the cell (exhibit 21) shows a great deal of blood confined to one area of the bed, a bloody mess on the floor immediately beside the bed, and clean space elsewhere in the cell. Shannon's severed penis is depicted, but it is not the focus of the photo. Also, although a corrections officer described the scene, the photo better evidences that Rushing's attack was confined to the bed area.

¶31　　　　While the autopsy photos are more disturbing, we reach the same conclusion. This was a shockingly violent murder, which had been vividly described to jurors by witnesses. It is unlikely that viewing the autopsy pictures so inflamed jurors that a danger of unfair prejudice existed. *See State v. Lopez*, 174 Ariz. 131, 139 (1992) ("Such photographs cannot be deemed sufficiently gruesome to inflame the jurors because 'the crime committed was so atrocious that photographs could add little to the repugnance felt by anyone who heard the testimony.'" (citation omitted)); *see also State v. Cota*, 229 Ariz. 136, 147 ¶ 46 (2012) ("[T]here is nothing sanitary about murder and sometimes gruesome photographs properly will be introduced." (citation and internal quotation marks omitted)).

### B. Aggravation Phase

¶32　　　　The jury found that Rushing murdered Shannon in an especially heinous or depraved manner, thereby establishing the aggravating circumstance under § 13-751(F)(6) ("The defendant committed the offense in an especially heinous, cruel or depraved manner."). Rushing argues that the State failed to prove the (F)(6) aggravator beyond a reasonable doubt. To resolve this argument, we must "determine whether substantial evidence support[ed] the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Gunches*, 225 Ariz. 22, 25 ¶ 14 (2010).

¶33　　　　The State proved that Rushing murdered Shannon in an especially heinous or depraved manner by inflicting gratuitous violence. *Cf. id.* at 25 ¶ 15 (listing "infliction of gratuitous violence" as among the factors generally relevant in determining heinousness and depravity).

Gratuitous violence can be found if the defendant "(1) inflicted more violence than that necessary to kill, and (2) continued to inflict violence *after he knew or should have known that a fatal action had occurred*." *Id.* at 25–26 ¶ 16 (quoting *State v. Bocharski*, 218 Ariz. 476, 494 ¶¶ 86–87 (2008)) (internal quotation marks omitted).

¶34 Rushing does not contest that sufficient evidence exists that he inflicted more violence than necessary to kill Shannon. Instead, he argues that insufficient evidence exists that he knew or should have known that he continued to inflict injury on Shannon after "a fatal action had occurred." He points out that no evidence showed the time it took to inflict the wounds, and Shannon lived for about an hour after the attack occurred. Thus, Rushing asserts that this case is closer to ones in which we have found insufficient evidence that defendants knew or should have known that additional injury was inflicted after "a fatal action" than cases in which we reached the opposite conclusion. *Compare Gunches*, 225 Ariz. at 26 ¶ 20 (finding insufficient evidence where the defendant fired three shots in quick succession on a dark night before the final shot), *and State v. Wallace*, 229 Ariz. 155, 161 ¶ 26 (2012) (finding insufficient evidence where the defendant hit the victim multiple times with a baseball bat before putting the bat through her neck as she moaned), *with State v. Benson*, 232 Ariz. 452, 464–65 ¶ 50 (2013) (finding sufficient evidence where the defendant admitted that the victim's body was getting cold when he dragged her into his car, drove somewhere, pushed her out of the car and then ran over her), *and State v. Bearup*, 221 Ariz. 163, 173 ¶ 52 (2009) (finding sufficient evidence where the defendant had beaten the victim "nearly to death" with an aluminum baseball bat and then about an hour later cut off his finger).

¶35 The record contains sufficient evidence that Rushing inflicted gratuitous violence by severing Shannon's penis after Rushing knew or should have known he had inflicted a fatal injury. The Trujillo statement placed the order of wounds as head, neck, and penis. As previously discussed, the circumstantial evidence supported this order as Shannon did not have any defensive wounds, the blood was all in or beside the bed, none of the blood spilled onto Shannon's lower legs and feet, and it's unlikely Shannon would have stayed put as his penis was severed had he been conscious. Considering the damage inflicted and the time it must have taken to switch weapons, sufficient evidence exists that Rushing knew or should have known he had delivered the fatal action before he severed the

11

penis. And even if he did not know he had struck a fatal blow when he started cutting away the penis, considering the time it must have taken to complete the attack, the jury could have reasonably concluded that he must have become aware that he had done so.

## C. Penalty Phase

### 1. "Future Dangerousness"

**¶36**        Before trial, Rushing unsuccessfully moved the trial court to instruct the jury pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality) that he is ineligible for release. Instead, the court instructed the jury at the start of the aggravation phase that if it decided to impose a life sentence, "the judge will sentence the defendant to either life imprisonment without the possibility of release from prison or life imprisonment with the possibility of release from prison after 25 years." The court did not again instruct the jury in the penalty phase about the available types of life sentences. Rushing argues that the court violated his rights under the Sixth, Eighth, and Fourteenth Amendments, as set forth in *Simmons* and *Lynch II*, 136 S. Ct. 1818, by refusing to instruct the jury that he was ineligible for parole. We review de novo whether the court properly instructed the jury. *See State v. Glassel*, 211 Ariz. 33, 53 ¶ 74 (2005).

**¶37**        In *Simmons*, the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156. Only juveniles and individuals who committed a felony before January 1, 1994, are eligible for parole in Arizona. A.R.S. § 41-1604.09(I). Rushing does not fall into either category. In the past, this Court has held that even when a defendant's future dangerousness is at issue, the type of instruction given by the trial court here does not violate *Simmons* because future release is possible. *See, e.g.*, *State v. Lynch*, 238 Ariz. 84, 103 ¶ 65 (2015) ("*Lynch I*"), *rev'd by Lynch II*, 136 S. Ct. 1818. But in *Lynch II* the Supreme Court rejected our holding. 136 S. Ct. at 1819. The Court determined that the possibilities of clemency or a future statute authorizing parole "[do not] diminish[] a capital defendant's right to inform a jury of his parole ineligibility." *Id.* And use of the word "release," while correct under Arizona law, still gives the defendant a right to inform the jury of his parole

ineligibility.  *See id.*

¶38        The State first argues that *Simmons* and *Lynch II* apply only when the prosecution puts the defendant's future dangerousness at issue. And because Rushing opened the door to the issue by eliciting expert testimony that he could be imprisoned without risk to others, he — not the prosecutor — put future dangerousness at issue, and thus a *Simmons* instruction was unwarranted.

¶39        *Simmons*, however, does not require that the prosecution initially raise the issue; it requires an instruction "where a capital defendant's future dangerousness is at issue" and the sentencing choices are death or life imprisonment without the possibility of parole.  *See Lynch II*, 136 S. Ct. at 1818 (citations and internal quotation marks omitted); *see also Escalante-Orozco*, 241 Ariz. at 285 ¶ 119 ("The prosecutor did not have to explicitly argue future dangerousness for it to be at issue; instead, it is sufficient if future dangerousness is 'a logical inference from the evidence' or is 'injected into the case through the State's closing argument.'" (quoting *Kelly v. South Carolina*, 534 U.S. 246, 252 (2002)).

¶40        Regardless, the State placed Rushing's future dangerousness at issue during the penalty phase.  For example, the prosecutor pointed out in her opening statement that Rushing shot his stepfather in the back of the head, killing him while he slept, threatened officers and got into fights in prison, and, a few months before the murder here, was found with two shanks hidden inside his rectum.  The prosecutor elicited information from a prison expert that Rushing was affiliated with the Aryan Brotherhood, once planned to form a Skinhead group "to bring things back in order" in Prescott upon release from prison, and accumulated disciplinary violations, including threats to kill corrections officers.  In closing argument, the prosecutor again highlighted Rushing's past acts of violence and emphasized the brutality of Shannon's murder.

¶41        By introducing evidence of Rushing's past violent acts, his associations with violent groups, and his plans upon release from prison, the prosecutor placed Rushing's future dangerousness at issue.  *Cf. Kelly*, 534 U.S. at 252–53 (requiring a *Simmons* instruction where the prosecutor introduced evidence of the defendant's violent tendencies and referred to him using violence-invoking nicknames); *Escalante-Orozco*, 241 Ariz. at 285–

86 ¶¶ 121–22 (concluding that introduction of past acts of violence and prosecutor's arguments placed the defendant's future dangerousness at issue). Because the trial court presented a "false choice" of death, natural life, or life with the possibility of release when it instructed the jury at the start of the aggravation phase, once it proceeded to the penalty phase, the court was required to either instruct that Rushing would not be eligible for parole or permit Rushing to introduce evidence to that effect. *See Simmons*, 512 U.S. at 161.

¶42        The State alternatively argues that any error was harmless. Even if we assume a *Simmons* error can be harmless, the State has not met its burden to "prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *Henderson*, 210 Ariz. at 567 ¶ 18.

¶43        The State asserts that jurors did not need a *Simmons* instruction to know that Rushing would not be released because he was already serving a life sentence for murdering his stepfather. Although it is unlikely any juror thought Rushing could be paroled, we are not persuaded beyond a reasonable doubt. The prosecutor implied that Rushing could be released by telling jurors in the penalty phase opening statement that the court had rejected the State's request for a natural life sentence for the step-father's murder and instead imposed a sentence of life with the possibility of release after twenty-five years. Rushing had served fourteen years of his life sentence at the time of trial, and he was then thirty-five years old. Some jurors might have believed that if the court again refused to impose a natural life sentence, Rushing could be released after serving twenty-five years of a second life sentence, whether that sentence was concurrent with or consecutive to the first sentence. The jury deliberated for most of a day, and it is not possible to know whether even the remote prospect of release affected any juror's decision to impose the death penalty. *See Escalante-Orozco*, 241 Ariz. at 286 ¶ 126 ("We cannot know what role the possibility of release played in the jurors' minds as they decided the propriety of the death penalty."); *cf. Andres v. United States*, 333 U.S. 740, 752 (1948) ("In death cases doubts such as those presented here should be resolved in favor of the accused").

¶44        In sum, the prosecution placed Rushing's future dangerousness at issue. *Lynch II* compels us to conclude that the trial court

erred by failing to tell the jury that Rushing was ineligible for parole. The error was not harmless beyond a reasonable doubt. Unless our abuse-of-discretion review reveals that the death penalty is unwarranted, the trial court must conduct new penalty phase proceedings.

### 2. Abuse of discretion review

**¶45** Rushing argues the jury abused its discretion in imposing the death penalty. *See* A.R.S. § 13-756(A). We must uphold a death sentence "if any reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *State v. Naranjo*, 234 Ariz. 233, 250 ¶ 89 (2014) (citation and internal quotation marks omitted). The jury did not abuse its discretion here.

**¶46** Rushing presented mitigation evidence that he suffered from "bipolar mood disorder," "unspecified trauma and stressor-related disorder," "attention deficit hyperactivity disorder," drug-related disorders, and "unspecified personality disorder with antisocial traits." He also offered evidence that his childhood was "extremely chaotic and filled with turmoil," and that he suffered from posttraumatic stress disorder (PTSD) resulting from being sexually abused during childhood.

**¶47** Rushing also presented evidence connecting his mitigation evidence to the murder. *See State v. Pandeli*, 215 Ariz. 514, 532 ¶ 72 (2007) (recognizing that establishing a nexus between mitigating factors and the crime, though not required, may affect the quality and strength of the mitigation). Dr. Stuart Grassian, a psychiatrist, interviewed Rushing and related Rushing's version of events. According to Rushing, Shannon became delusional during their joint confinement and "started talking a lot about sex with children," which made "everyone out to get him." At one point, Rushing showed Shannon a picture of his young niece, and Shannon made sexually inappropriate comments about her. The day before his death, Shannon was "absolutely wired" on coffee and talked incessantly about sex with children, which drove Rushing to threaten him with the bludgeon device to quiet him. When Shannon started talking about sex with children again, Rushing "just went crazy" and killed him. Dr. Grassian concluded that Rushing "snapped" as "happens to people with bipolar mood disorder, people in solitary confinement, [and] people with

15

PTSD."

¶48        Dr. Jon Conte, an expert on child abuse, related similar testimony.  He opined that Rushing was an "untreated victim" of child abuse who lacked the skills to refrain from "acting out" when confronted with distressing circumstances.

¶49        On the other hand, the State cross-examined the expert witnesses and discredited some of their assertions.  And the jury may have concluded that Rushing had lied to his experts about being driven to kill Shannon by the latter's talk about sex with children.  The murder was committed in a disturbing manner and, at the time of the offense, Rushing was imprisoned for a different murder.  Even if we assume that Rushing proved all his mitigating circumstances, we cannot find that the jury abused its discretion because a reasonable juror could have concluded that the mitigation presented was not sufficiently substantial to call for leniency.

### 3. Matters likely to arise on remand

### a. Scope of State's mental health expert examination

¶50        Rushing argues that the trial court violated his Fifth, Eighth, and Fourteenth Amendment rights by requiring him to either answer questions posed by the State's mental health expert during a pretrial examination regarding the murder or forego presentation of his mental health expert testimony during the penalty phase.  We address this argument because it is likely to arise on remand, and we review the court's ruling for an abuse of discretion. *See Phillips v. Araneta*, 208 Ariz. 280, 281 ¶ 1 (2004).

¶51        Before trial, Rushing notified the State that he intended to introduce expert testimony to establish two statutory mitigating circumstances during the penalty phase (if one occurred):  § 13-751(G)(1) ("The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."), and § 13-751(G)(2) ("The defendant was under substantial duress, although not such as to constitute a defense to prosecution.").  The State scheduled

an examination of Rushing with Dr. James Seward, its mental health expert. *Cf. Phillips*, 208 Ariz. at 283 ¶ 9 ("[O]nce a defendant notifies the state that he intends to place his mental condition at issue during the penalty phase of a capital trial, a trial judge has discretion to order the defendant to submit to a mental examination by an expert chosen by the state or the court."). The prosecutor reportedly instructed Dr. Seward that "whatever [Rushing] told him about the offense could not be relayed to the State until [Rushing] had been convicted of the murder and that any statements regarding the murder would have to be redacted from this report and his notes prior to disclosing either to the State."

**¶52**         Rushing moved to preclude Dr. Seward from asking about the murder or statements Rushing had made about the murder. The trial court initially granted the motion, but later reconsidered, reasoning that the circumstances of the offense were related to the alleged statutory mitigators. Following the requirements in *Phillips*, the court ruled:

> Dr. Seward is not restricted in the questions he may ask the defendant. However, no statement made by the defendant during the examination, no testimony of an expert based on any such statement, and no other fruits of any statements made during the course of any examination may be used by the State or admitted into evidence except on those issues on which the defendant introduces expert testimony during the penalty phase of the trial. Specifically, the defendant's statements regarding the offense may not be used against him in the guilt or aggravation phases of trial.

*See Phillips*, 208 Ariz. at 284 ¶ 14 (setting forth the required elements for a trial court order authorizing the state's expert to conduct a mental health exam).

**¶53**         Rushing concedes that, under *Phillips* and its progeny, a trial court can condition admission of a defendant's mental health-related mitigation evidence on his cooperation with the state's mental health evaluation. *See Phillips*, 208 Ariz. at 286 ¶ 20; *see also State v. Newell*, 212 Ariz. 389, 405 ¶¶ 79–80 (2006); *State v. Carreon*, 210 Ariz. 54, 68–69 ¶ 74 (2005). He argues, however, that no case permits the trial court to compel a defendant to waive his Fifth Amendment privilege during an examination

17

and reveal the circumstances of the murder for which he faces the death penalty.

**¶54** We reject this argument for two reasons. First, although the Fifth Amendment applies in penalty phase proceedings, *see Estelle v. Smith*, 451 U.S. 454, 462–63 (1981), a defendant waives the privilege against compelled self-incrimination by placing his mental health at issue as a mitigating factor, *State v. Fitzgerald*, 232 Ariz. 208, 217 ¶ 44 (2013). Second, imposing the blanket prohibition Rushing seeks would thwart the reason for permitting the examination. In *Phillips*, we reasoned that a state's expert can be permitted to examine a defendant who places his mental health at issue in the penalty phase to "maintain a fair state-individual balance," and to "ensure the state a meaningful opportunity to rebut the defendant's expert testimony." 208 Ariz. at 283 ¶ 9. Here, as the trial court found, Rushing's statutory mitigators related to the circumstances of the offense. It would therefore be unfair to have prohibited Dr. Seward from asking questions concerning the offense.

**¶55** The potential unfairness to the State is illustrated by considering the defense expert testimony during the penalty phase. Had the trial court granted Rushing's motion, the State's expert would have had no opportunity to explore whether Rushing's mental state at the time of the offense had been affected by the conditions of the cell or Shannon's constant references to sex with children. In short, the State could not have meaningfully determined whether Rushing had, in fact, "snapped" as Dr. Grassian claimed. The court did not abuse its discretion by allowing Dr. Seward to ask about the murder.

### b. Rebuttal evidence

### (i) The September 10 interview

**¶56** Rushing argues that videotaped statements he made to prison investigators Dallas Ragan and Tom Bleichroth on the afternoon of the murder were inadmissible in the penalty phase because (1) he invoked his right to remain silent under *Miranda* after initially agreeing to the interrogation, and (2) the investigators made promises to induce his statements. We review the court's denial of Rushing's motion to suppress for an abuse of discretion, "considering only evidence admitted at the

suppression hearing and viewing it in the light most favorable to sustaining the ruling." *Escalante-Orozco*, 241 Ariz. at 269 ¶ 21. But we review constitutional issues de novo. *Id.*

### *Miranda*

¶57 If an in-custody individual unambiguously indicates a desire to cut off questioning after initially waiving *Miranda* rights, officers must end the interrogation. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). Whether an invocation is ambiguous is "judged from the perspective of a reasonable officer under the totality of the circumstances." *State v. Payne*, 233 Ariz. 484, 501 ¶ 40 (2013).

¶58 After being advised of his *Miranda* rights, Rushing agreed to answer questions. When Ragan asked Rushing about Shannon, the following exchange occurred (the statements at the heart of Rushing's challenge are bolded):

> Ragan: What was your relationship like as you guys were housed there together over the past couple of weeks?
>
> Rushing: Very interesting to say the least. Very interesting.
>
> Ragan: How so?
>
> Rushing: **Uh, I'm not sure I should say anything. I don't know.**
>
> Ragan: You don't know? Did you guys get along? At first?
>
> Rushing: Yeah, at first, yeah. Absolutely.

Rushing then described how Shannon had upset him by incessantly talking about sex with young children. When Ragan asked what occurred that morning, the following exchange occurred:

> Ragan: I kind of would like to hear what went on today out of your mouth. I'm pretty intrigued about it and I'm going to leave that up to you to discuss with us. And basically I, you know, if you do, you know, go into some dialogue with us

19

about it[,] kind of start from how your morning started and kind of work your way, you know, through the events up until they pulled you out of the cell.

Rushing: I realize that you guys are probably intrigued but I think the actual details of what happened **I probably should not talk about.**

Ragan: Is there anything at all that you can tell us about?

(Rushing shakes head)

Rushing: **I don't know. Not really**. I mean . . . (tapers off)

Ragan: Again, it's. I mean it's up to you, I mean frankly I don't I know that—I know that you're serving a life sentence already, you know, it's — I don't think in the long run it's really going to make too much of a difference in—in your custody time, you're not going to get out and . . .

Rushing: No.

Ragen: So it's, I mean not that I'm trying to pressure you into anything but[.]

Rushing eventually confessed to the crime and gave full details about the murder.

¶59 Rushing's statements were not unambiguous invocations of his right to remain silent. Considering Rushing's words, demeanor, and body language on the video, a reasonable law enforcement officer could have concluded that Rushing's statements communicated only that he had doubts about whether to disclose details of the crime. *Cf. Davis v. United States*, 512 U.S. 452, 462 (1994) ("Maybe I should talk to a lawyer" was not an unambiguous request for counsel); *Payne*, 233 Ariz. at 501 ¶¶ 40–41 ("I don't wanna talk anymore" followed shortly by a request to call family "and then I'll talk" was equivocal and insufficient to invoke right to silence.). Requiring officers to cease an interrogation after an accused states only that he should "probably" not discuss any details of an alleged crime,

that he is "not sure" about whether he should say anything, or that there was "not really" anything he could say would force police officers to "make difficult decisions about an accused's unclear intent and face the consequences of suppression 'if they guess wrong,'" resulting in a "significant burden on society's interest in prosecuting criminal activity." *Berghuis*, 560 U.S. at 382.

**Voluntariness**

**¶60**　　　　To be admissible, a statement must be made voluntarily and not obtained by coercion or improper inducement. *See State v. Ellison*, 213 Ariz. 116, 127 ¶ 30 (2006). "Promises of benefits or leniency, whether direct or implied, even if only slight in value, are impermissibly coercive." *Lopez*, 174 Ariz. at 138. "Before a statement will be considered involuntary because of a 'promise,' evidence must be established that (1) a promise of benefit or leniency was in fact made, and (2) the suspect relied on that promise in making the statement." *Id.*

**¶61**　　　　Rushing contends that Ragan's statement, "I don't think in the long run it's really going to make too much of a difference in—in your custody time, you're not going to get out" was a promise of leniency that made Rushing's subsequent statements involuntary. We disagree. Ragan's observation was clearly his own opinion and did not suggest that he had the ability to affect Rushing's sentence. *Cf. Burr*, 126 Ariz. at 340 (finding that a conversation should have been suppressed after a detective, who had the authority to make an arrest, said "I'm not going to arrest you or put you in jail or anything, but before I ask you anymore I've got to tell you what your rights are").

**¶62**　　　　The trial court did not err by refusing to suppress evidence of the September 10 interview.

### (ii)　　The September 24 interviews

**¶63**　　　　On September 24, Department of Corrections Investigator Ernest Barragan interviewed Rushing twice as part of an internal investigation. Both interviews were conducted without giving Rushing any

21

*Miranda* warnings, and he answered questions about the crime.

**¶64** Rushing argues the trial court erred by permitting the prosecution to play an audiotape of the interview as rebuttal evidence during the penalty phase because the statements were involuntary and obtained in violation of *Miranda*. The State counters with multiple arguments, including that Rushing was not in custody for purposes of *Miranda*, and that statements obtained in violation of *Miranda* can nevertheless be admitted in the penalty phase if they were made voluntarily and are reliable, as are the statements here. *Cf. Howes v. Fields*, 565 U.S. 499, 508–09 (2012) (establishing a two-part inquiry to assess whether an inmate is in custody for *Miranda* purposes); *United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006) ("[S]tatements obtained in violation of *Miranda*, if they are otherwise voluntary, may generally be considered at sentencing.").

**¶65** We decline to resolve these issues because they have not been fully developed before the trial court or ruled on. If the State seeks to introduce the audiotape on remand, the court should resolve the parties' arguments in the first instance, including making any necessary factual findings.

### (iii) White supremacist evidence

**¶66** Rushing argues that the trial court violated his rights under the First, Eighth, and Fourteenth Amendments by allowing the prosecutor to introduce rebuttal evidence regarding his white supremacist views, memberships, and affiliations.

**¶67** We likewise decline to resolve this issue because it has not been fully developed before the trial court or ruled on. Before trial, the court deferred its ruling on the admissibility of this evidence in the penalty phase "until mitigation is disclosed and we can have an argument about what's coming in and what's not." This never occurred. On remand, the court may admit all or some of the contested evidence if it is relevant to determining whether the mitigation is sufficiently substantial to warrant leniency and is not unduly prejudicial. *See State v. Leteve*, 237 Ariz. 516, 528–

29 ¶ 47 (2015); A.R.S. §§ 13-751(C) and (G), -752(G).

### D. Other constitutional claims

**¶68**         Rushing lists twenty-five other constitutional claims that he acknowledges this Court has previously rejected but that he seeks to preserve for federal review.  We decline to revisit these claims.

## CONCLUSION

**¶69**         We affirm Rushing's conviction, vacate the death sentence, and remand for a new penalty phase proceeding.